# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. ACTION NO.  09-00133 |
| VERSUS | JUDGE ROBERT G. JAMES |
| DANIEL ESTES CROOK | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court is a Motion for New Trial [Doc. No. 81] filed by Defendant Daniel Estes Crook ("Crook").  For the following reasons, the motion is DENIED.

## I.       Introduction and Procedural History

This case arises from Crook's participation in rice farming activities.  In 1998, a drought caused major crop losses for rice farmers in the Northeast Louisiana area.  Affected farmers could apply to the Government for payments from the Crop Loss Disaster Assistance Program ("CLDAP").  Affected farmers could also apply to the Government for emergency loans to continue farming.

In April 1999, Crook Farms Partnership ("CFP") applied for disaster benefits and an emergency loan.   Although he was not a partner, Crook held a power of attorney for CFP and submitted an application for CLDAP payments on its behalf, stating that CFP was only able to harvest approximately 29,106.94 cwt (hundredweight) of rice during the 1998 crop year.  CFP also applied for an emergency loan.  As part of the application process, Crook stated in the "Certification of Disaster Losses" that CFP had a rice yield of 23.98 cwt (hundredweight) per acre for a total of 1,558.20 acres for the 1998 crop year.

On October 10, 2003, Assistant United States Attorney ("AUSA") Martha Levardsen ("Levardsen") wrote Crook a letter in which she asserted that he had committed violations of 18 U.S.C. § 1001 and offered him the opportunity to plead guilty to a bill of information.  Hoping to resolve the matter, on February 10, 2004, Crook signed a Waiver of Statute of Limitations, agreeing to waive the statute of limitations set to run on March 15 and April 8, 2004.  Crook and his counsel, Thomas Davenport ("Davenport"), also met with Levardsen on April 6, 2004.  After that meeting and further investigation, in a May 3, 2004 letter to Davenport, Levardsen stated that "the Government would be unable to prove its case against [Crook] beyond a reasonable doubt" and, thus, the Government was declining prosecution. [Proffer 4].

Between January and August 2005, Crook either sold or traded farm equipment which had been mortgaged or pledged to the Farm Service Agency ("FSA") to benefit Crook Planting Company ("CPC"), an entity in which he was a partner.  Cook then disposed of the subsequent equipment or proceeds of the sale without notifying and obtaining the consent of the FSA.

In a March 23, 2006 letter, AUSA Mignonne Griffing ("AUSA Griffing") notified Davenport that then-United States Attorney Donald Washington had concerns that Levardsen improperly declined prosecution.  The Government reopened the case to investigate Crook's possible violations of 18 U.S.C. §§ 1014 and 1001.

On June 25, 2009, Crook was indicted and charged with two counts of violating 18 U.S.C. § 1014 by knowingly making false statements to the FSA regarding CFP's rice production for the 1998 crop year to support its application for CLDAP payments (Count 1) and for an emergency loan (Count 2).  He was also charged with six counts of violating 18 U.S.C. § 658 by converting farm equipment which was collateral for an FSA loan to CPC.  Each of the six counts

addressed a piece or pieces of farm equipment: (1) Count 3 alleged that Crook traded equipment and received a Case 2388 Combine in return, which he then disposed of; (2) Count 4 alleged that Crook sold a John Deere 9965 Cotton Picker; (3) Count 5 alleged that Crook traded equipment and received a Case 7140 Tractor in return, which he then disposed of; (4) Count 6 alleged that Crook sold a John Deere 9960 Cotton Picker; (5) Count 7 alleged that Crook sold two Shelborne Rice Headers; and (6) Count 8 alleged that Crook traded equipment and received a Case 2188 Combine in return, which he then disposed of.

On September 28, 2009, Crook filed a Motion to Dismiss Indictment on Counts 1 and 2. After briefing was complete, on November 10, 2009, the Court issued a ruling denying Crook's motion because the Indictment on those counts did not violate the Ex Post Facto Clause and neither the charges being pursued nor the time delay in prosecuting constituted a Due Process violation.  [Doc. Nos. 34 & 35].

After a continuance, trial was set on July 12, 2010.  Prior to trial, on June 18, 2010, the Government filed a Notice of Intent to Introduce 404(b) Evidence [Doc. No. 42].  The Government notified the Court and Crook that it intended to introduce evidence at trial that Crook fraudulently disposed of collateral that had been pledged to the FSA to secure the emergency loan to CFP, conduct for which he had not been charged.  Crook filed a memorandum [Doc. No. 43] opposing the introduction of this evidence.

On July 5, 2010, the Government filed its first Motion in Limine [Doc. No. 44], moving the Court to exclude from evidence the letters from AUSA Levardsen, identified as Exhibit 1026 and 1027.  On July 9, 2010, Crook filed a memorandum in opposition [Doc. No. 45].

On July 12, 2010, trial commenced.  On that day, the Court granted the Government's

Motion in Limine and excluded the Levardsen letters from evidence.  The Court indicated that it was not inclined to allow the Government to introduce evidence of Crook's alleged fraudulent disposition of collateral pledged to secure an emergency loan from the FSA to CFP.  Thereafter, the Government filed a Supplemental Request to Use 404(b) Evidence [Doc. No. 48], urging the Court to allow it to introduce the evidence and citing authority for its position.

On the second day of trial, July 13, 2010, the Court heard further argument on the Rule 404(b) evidence and then ruled that the Government would be permitted to introduce the evidence, subject to review and consideration as the witnesses were presented.  Crook objected to that ruling.  Testimony then commenced, but trial was recessed when Crook's counsel became ill.

The following day, July 14, 2010, during an in-Chambers conference, the Court was informed that Crook's counsel was still unable to continue with trial, but hoped to be ready the next day.

The trial continued on July 15, 2010.  Because of a family emergency, lead Government counsel, AUSA Robin McCoy ("McCoy"), was unable to continue trying the case.  Her co-counsel, AUSA Griffing, became the lead counsel, and the Court granted the motion of AUSA Alex Van Hook ("Van Hook") to enroll as co-counsel.

The trial continued until July 20, 2010, when the jury returned a verdict of guilt against Crook on all counts.

On July 30, 2010, Crook sought an extension of time to file post-trial motions.  The Court granted his motion, and Crook's deadline was extended to August 18, 2010.  After a second extension of time, on August 23, 2010, Crook timely filed a Motion for New Trial [Doc. No. 81]

4

and supporting memorandum [Doc. No. 83].  After moving for and receiving an extension of time, the Government filed its memorandum in opposition to the Motion for New Trial on September 9, 2010 [Doc. No. 86].  Although he was granted an extension of time to do so, Crook did not file a reply memorandum.

## II.    Law and Analysis

Federal Rule of Criminal Procedure 33 provides, in pertinent part:

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . .

FED. R. CRIM. P. 33(a).  "The interest of justice is not an independent ground for granting a Rule 33 motion, but rather is the standard for granting any Rule 33 motion." *United States v. Wall*, 389 F.3d 457, 468 (5th Cir. 2004) (citing *United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003)).  The trial judge's determination in the interest of justice may be based on his evaluation of witnesses and weighing of the evidence.  *Wall*, 389 F.3d at 465-66.  Generally, however, the Fifth Circuit Court of Appeals has held "that the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.  A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." *Id.* 466 (citations omitted).  "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *Id.* at 474 (citing WRIGHT, FEDERAL PRACTICE & PROCEDURE § 556 (3d ed. 2004)).

In this case, Crook identifies four alleged errors by the Court to support his Motion for New Trial: (1) failure to charge the jury concerning the effect of the assignment of a creditor's right; (2) permitting the Government's introduction of Rule 404(b) evidence; (3) refusal to allow

the testimony of banking expert, William Gary Brannon ("Brannon")[1]; and (4) refusal to allow

the introduction of banking records and the Levardsen letters.  Additionally, Crook identifies

three instances of prosecutorial misconduct, which he contends also support his Motion for New

Trial: (1) AUSA Griffing's erroneous statements during closing argument concerning 62¢ per

bushel rice; (2) AUSA Griffing's erroneous statements during closing arguments concerning Dr.

Louie Crook, Jr.'s employment at the Willis-Knighton Hospital Emergency Room; and (3) the

Government's releasing of witness Tom Casey without notifying counsel for Crook.  Finally,

Crook argues that the jury's verdict is against the weight of the evidence on all counts.

### A.    Judicial Error

#### 1.    Jury Charges

Crook first argues that the Court committed judicial error by failing to give the following

jury instruction based on Louisiana Civil Code article 2643:

> A creditor's assignment or transfer of a right is effective against the debtor only
> from the time the debtor has actual knowledge, or has been given notice of the
> assignment.

Crook contends that the instruction was crucial to his defense to Counts 3-8 which alleged that he

converted farm equipment subject to a lien by the FSA.  Cook asserts that when he traded and/or

sold the equipment identified in those counts, he did not intend to defraud the FSA, but turned

over the proceeds to CPC's lender, Bank One, which he believed held a first lien on the

equipment.

A district court's failure to give a jury instruction is reversible error only if the requested

---

[1]Brannon has been referred to as "Gary Brannon," but his resume identifies him as "William
G. Brannon."  For clarification, the Court identifies him by his first and middle names.

instruction:

(1)     was a substantially correct statement of the law,

(2)     was not substantially covered in the charge as a whole, and

(3)     concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.

*United States v. Richards*, 204 F.3d 177, 204 (5th Cir. 2000).  The parties and the Court agree that the requested instruction was a substantially correct statement of law and that this law was not substantially covered in the charge as a whole.  Thus, the issue is whether the Court's refusal to include this instruction seriously impaired Crook's ability to present his defense.

At trial, the Court permitted Crook to testify as to his knowledge about the liens on the equipment he was accused of converting.  Crook testified that he was aware that Bank One[2] and the FSA both had liens on the equipment, but he believed that Bank One remained the first lienholder.  He further testified that he was unaware that the FSA had become the first lienholder and presented other testimony and evidence that supported his defense.  Although Crook's counsel cited article 2643 at trial, Crook did not testify that he was aware of this article prior to the conversion of the equipment.

Crook requested that the Court instruct the jury based on article 2643.  The Government requested a different instruction that also addressed this issue.  However, based on *United States v. McClatchy*, 249 F.3d 348 (5th Cir. 2001), the Court declined to give either instruction.  In *McClatchy,* the defendant had been convicted by a jury of six counts of a seven-count indictment

_____

[2]For consistency, the Court will refer to Bank One, but it was previously known as Central Bank, and after the events at issue, it became known as Chase Bank.

7

involving conversion of pledged crops, money laundering, engaging in a monetary transaction involving criminally derived property greater than $10,000 in value, and crop insurance fraud. Like Crook, McClatchy defended the allegations against him, in part, by citing to various state lien statutes and pointing out that he had "legitimately exhausted the crop proceeds, leaving nothing for the [Farmer's Home Administration's][3] lien." *Id.* at 355. The Fifth Circuit found McClatchy's arguments "unavailing" because the "state statutes in no way provide a defense to the federal crimes of which McClatchy was convicted." *Id.* While McClatchy's "reliance on the state statutes at the time he converted the pledged crops may raise a question regarding his intent to defraud," *id.*, the Fifth Circuit found that the Government presented other evidence from which the jury could have found intent.

Addressing McClatchy's argument that the trial court erred in refusing his requests for certain jury instructions, the Fifth Circuit ruled that "[t]he substance of the good faith and specific intent instructions that McClatchy requested was adequately covered in the [trial] court's charge." *Id.* at 356. The trial court "did not abuse its discretion in refusing McClatchy's requested instructions containing quotes from various sections of the Mississippi Code pertaining to statutory liens and security interests . . . [because] those statutes do not provide a defense to the crimes of which McClatchy was convicted and thus are irrelevant." *Id.* at 356-57.

Applying *McClatchy*, this Court refused to give either of the instructions requested by Crook and the Government about the state lien statutes because those statutes did not provide a defense and were irrelevant to the jury's determination. The Court agreed that Crook's belief as to his duties under the state statutes could be relevant to his specific intent to defraud, but Crook

---

[3]The Farmer's Home Administration is the predecessor to the FSA.

did not claim that he knew about article 2643 and paid Bank One (instead of the FSA) based on that article.  Crook was permitted to testify as to his knowledge and actions, and the jury was given instructions on both good faith and intent.  In pertinent part, the jury instructions stated:

> Good faith is a complete defense to the charges in the Indictment since good faith on the part of the Defendant is inconsistent with intent to defraud, which is an essential part of the charges. . . With respect to each of the counts charging fraud, if Defendant believed in good faith that he was acting properly, even if he was mistaken in his belief and even if others were injured by his conduct, you cannot convict him of the specific charge being considered.

Additionally, with regard to the six counts of Crook's knowing disposition of pledged property, the jury was instructed that the Government must prove beyond a reasonable doubt that Crook "acted with the intent to defraud the United States Secretary of Agriculture, acting through the FSA," and defined "'intent to defraud'" to mean that Crook acted "with intent to deceive or cheat someone."

The jury instructions, when viewed in their totality, properly instructed the jury as to the Government's burden and Crook's available defense.  The Court finds no error that would require reversal on appeal, or that had an adverse effect on Crook's substantial rights.  Crook was able to present his defense adequately without the instruction he requested, and his Motion for New Trial is DENIED on this basis.

### 2.    Government's Rule 404(b) Evidence

Crook's next assignment of error is the Court's ruling which allowed the Government to introduce evidence pursuant to Federal Rule of Evidence 404(b) concerning the sale of his cotton gin and airplane.

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is admissible "as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  In *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), the Fifth Circuit laid out the two-step test for admission of extrinsic evidence of prior offenses or other misconduct under rule 404(b).  "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character.  Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."  *Id.*

Crook was charged in Count 2 with intentionally under-reporting CFP's rice yield for the 1998 crop year, so as to secure an emergency loan from the FSA. In order to obtain the loan, CFP also had to provide collateral, but it had only $26,000.00 in farm equipment, and the FSA would not have made the loan without additional collateral.  CFP's partners--Crook's father, brother, and cousin--pledged a security interest in a Cessna airplane and cotton gin without disclosing that Crook owned both.  Because Crook's ownership was not disclosed, the FSA did not asked Crook to execute a security agreement.

Crook subsequently disposed of the pledged collateral and proceeds.  In 2000, the airplane was destroyed in a storm, and Crook received $25,000.00 from his insurer, but did not report the destruction of the airplane or the insurance payment to the FSA.  Also, in 2000, Crook disassembled and sold the cotton gin.  He did not report to the FSA four payments for cotton gin parts totaling $97,000.00.

At trial, the Government sought to introduce evidence of (1) the security agreement and note for the emergency loan to CFP and (2) Crook's actions with regard to selling the gin and airplane.  While the security agreement and note were not signed by Crook, the Government

contended that Crook knowingly and intentionally failed to disclose that he, not CFP, was the true owner of the airplane and cotton gin listed as collateral on the agreement.  As part of the evidence in support of this claim, the Government presented the testimony of an FSA employee, Colby Flint ("Flint"), who testified that either Crook or his farm manager, Philip Sivils ("Sivils"), added these items as collateral.  Flint further testified that, even if Sivils added the items, Sivils did not act without Crook's approval, based on his experience.  While Sivils testified that he did not remember adding the cotton gin and airplane as collateral, he testified that he would not have pledged Crook's personal property without his consent.  Additionally, Paula Davis, a bank employee, testified that Crook told her that FSA had made him pledge his airplane to get loans.  In defense, Crook contended that he had no knowledge that his property was listed as collateral for the loan to CFP.

Under the broad relevance standard, the Court found that this evidence was relevant to Crook's intent or lack of mistake in allegedly under-reporting CFP's 1998 rice production to obtain an emergency loan, as set forth in Count 2.  The Court found that the evidence was also relevant to his intent or lack of mistake with regard to his conversion of collateral pledged for loans to another entity, CPC, as set forth in Counts 3-8.  That is, Crook's actions in alienating collateral pledged to the FSA for a loan to CFP was relevant to his actions in alienating collateral pledged to the FSA for loans to CPC.  While the evidence was indeed prejudicial to Crook, the Court found that the probative value of the documents and Crook's actions with regard to the cotton gin and airplane was not substantially outweighed by undue prejudice.

Having fully reviewed the record, the Court finds no reversible error in its ruling, and Crook's Motion for New Trial on this basis is DENIED.

### 3.      Exclusion of Banking Expert

Crook next argues that the Court committed judicial error by refusing to allow the testimony of his banking expert, Brannon.  Prior to trial, Crook identified Brannon as a possible expert and provided his resume to AUSA McCoy.  Crook did not provide the Government with a summary of Brannon's potential testimony, despite the Government's request for reciprocal discovery, and as required by Federal Rule of Criminal Procedure 16(b)(1)(C).

The second day of trial, July 13, 2010, Crook's counsel, Carey Underwood ("Underwood"), noted that his expert, Brannon, was in the courtroom and that he would like Brannon exempted from the rule of sequestration.  At that time, the Government objected that it had not been provided notice that Crook intended to call an expert, that it had not received a summary of his proposed testimony, and that it would oppose his testifying.  The Court deferred ruling at that time.  About 1 ½ hours after trial commenced, Underwood became so ill that he could not continue.  Prior to recessing, the Court asked Underwood to provide the Government with a summary of Brannon's testimony that day, if possible.

Because of Underwood's illness, trial was not held on July 14, but resumed on July 15.  During a break in testimony, the Court inquired as to whether Crook intended to call Brannon as a witness.  When Underwood stated that Crook would call Brannon as a witness, the Government renewed its objection.  By 10:00 P.M. the night of July 15, the Government's counsel still had not received a summary of Brannon's potential testimony and filed a second Motion in Limine [Doc. No. 57].  The following morning, Crook provided a summary of Brannon's  potential testimony to the Government and orally opposed its Motion in Limine in an in-Chambers conference.  After reviewing Rule 16(b)(1)(C) and considering the argument of counsel, the

12

Court found the prejudice to the Government to be too great and issued a ruling excluding

Brannon's testimony [Doc. No. 60].

Rule 16(b)(1)(C) provides in pertinent part:

The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if--

(i)    the defendant requests disclosure under subdivision (a)(1)(G) and the government complies . . .

This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

If a defendant fails to comply with Rule 16(b)(1)(C), the Court is authorized by the Rule to take

the following actions:

(A)    order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;

(B)    grant a continuance;

(C)    prohibit that party from introducing the undisclosed evidence; or

(D)    enter any other order that is just under the circumstances.

FED. R. CRIM. P. 16(d)(2).

Given the very late disclosure of Brannon's testimony and the Government's stated need

to retain an expert if Brannon were permitted to testify, the Court found the prejudice to the

Government to be too great to allow Brannon to testify and that a continuance or other remedy

was inappropriate given the time already invested by counsel, the Court, and the jury.  Therefore,

the Court excluded Brannon's testimony.  *See United States v. Whitfield*, 590 F.3d 325, 362 (5th

Cir. 2009).  The Court finds that it properly barred Brannon's testimony based on the facts and

circumstances.

Crook argues, in the alternative, that his counsel was ineffective for failing to realize that a reciprocal discovery request by the Government would trigger the provisions of Rule 16(b)(1)(C) and require him to provide the summary of Brannon's proposed testimony.  Thus, he contends that he is entitled to a new trial based on counsel's error.

Even if counsel was ineffective, his error did not affect Crook's substantial rights or prejudice his defense.  In defense to charges contained in Counts 3-8, Crook argued that he did not knowingly dispose of or convert mortgaged equipment with the intent to defraud the FSA, but instead gave the proceeds to the bank, which he believed would pay FSA.  According to the summary provided to the Government, Crook intended to call Brannon to support this defense by testifying as follows:

> It is anticipated that Mr. Brannon will testify concerning the documents executed in connection with the emergency loans, the UCC filings by the bank and the FSA, and the effect of the same.  Mr. Brannon will testify that it is his opinion that the bank initially had a first lien on all the equipment involved, but was relegated to a second lien position behind the FSA once the partial assignments were executed.  In Mr. Brannon's opinion, when the bank was given the money from Daniel Crook for the sale of equipment which was included in the partial assignment, the bank was obligated to forward those funds to the first lienholder, the FSA.  Mr. Brannon will discuss how these transactions normally occur and the obligations of the parties.  Mr. Brannon is also of the opinion that until the debtor receives actual notice of the partial assignment, it is within his rights to pay the assignor.

[Crook's Proffer 7].  In its ruling on the Government's Motion in Limine with regard to Brannon's testimony, the Court noted that it need not reach the admissibility of Brannon's testimony, but expressed

> serious reservations whether it would permit Brannon to testify, even if the Government had been given a timely summary.  The Court would certainly

14

exclude any testimony regarding the law on the effect of the filing of the partial assignments and the obligations of the bank, and it is not clear that Brannon's remaining testimony is relevant or that it could not be addressed by other witnesses.

[Doc. No. 60, p. 4].  The Court stands by those conclusions.  Other witnesses, including Crook himself, were available to testify about the specific transactions at issue and how such transactions are normally handled.  The "opinions" Brannon would have expressed were legal conclusions about which he could not have testified. The exclusion of Brannon's testimony on procedural grounds, even if based on counsel's ineffective assistance, did not prejudice Crook's defense as there is no reasonable probability that his admissible testimony would have affected the outcome of the trial.  Crook's Motion for New Trial on this basis is DENIED.

### 4.  Exclusion of Crook's Exhibits of Bank Documents and Levardsen Letters

Crook also argues that the Court committed judicial error by excluding Exhibits 42/Proffer 1 and 45/Proffer 2, "Standard Summary Authorizations" prepared by Bank One, and Proffers 3 and 4, letters from AUSA Levardsen to Crook and his former counsel.

### a.  Bank One Standard Summary Authorizations

Prior to trial, the Government produced April 4, 2004 and September 27, 2004 Standard Summary Authorizations to Crook along with a Certificate of Regularly Conducted Business Activity prepared by a Bank One employee.  The Government did not seek to offer these bank records into evidence, nor did it stipulate that the records were admissible.  Crook offered the bank records into evidence over the Government's hearsay objection during the testimony of Craig Littleton ("Littleton"), a former employee of Bank One.  At the time Exhibit 42/Proffer 1 was offered into evidence, Littleton had testified that he learned of the FSA's lien on CPC

15

equipment from an underwriting package.  Crook then attempted to offer the April 4, 2004 Standard Summary Authorization into evidence.  The Government objected that both Standard Summary Authorizations were inadmissible because they did not meet all the requirements of the business records exception, they contained third-party hearsay (hearsay within hearsay), and they were being offered to show the bank's state of mind, which was irrelevant to Crook's state of mind or intent.  After consideration, the Court excluded the records as irrelevant, never reaching the remaining arguments.

In his Motion for New Trial, Crook contends that the Court "sustained [the Government's] hearsay objection," that the ruling was "erroneous," and that a new trial is required on the basis of this error.   According to Crook, the bank records would have supported his defense to Counts 3-8 because they showed that "even the bank forgot about the partial assignment of the farm equipment to the FSA [on behalf of CPC] and even the bank, at one time, thought it had the first lien on the farm equipment."  [Doc. No. 81, p. 10].  Crook argues that the records also "reveal[ed] it was Dr. Crook's belief that [Bank One] had the first lien on the farm equipment." [Doc. No. 81, p. 10].

First, the Court notes that it did not sustain the hearsay objection, but excluded the evidence as irrelevant and, thus, inadmissible.  At the time the Court considered this issue, Crook's record argument focused on the bank's state of mind, not on Crook's.  The Court finds no reason to set aside this ruling.  Even if Bank One recognized that there was some confusion about whether the FSA had a first or second lien, Bank One's state of mind does not make it more or less probable that Crook knowingly converted property mortgaged to the FSA with the intent to defraud.  *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any

16

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

However, Crook now makes the argument that statements contained in the Standard Summary Authorizations support his contention that he did not know the FSA had a first lien and that he did not intend to defraud the FSA. That is, he contends that the records are relevant to show **his** state of mind. Exhibit 42/Proffer 1, the April 5, 2004 Standard Summary Authorization, contains a narrative portion, captioned "Checklist Notes." In that section, the report states: "In July 1999 we made a partial assignment of our UCC-1 filing to the FSA, that assignment pretty much covered the majority of the equipment owed today that was not financed by purchase money. Apparently, the fact this had occured [sic] was forgotten by the debtor [Crook] and he believes we have the first lien position." [Exhibit 42/Proffer 1]. Similarly, Exhibit 45/Proffer 2, the September 27, 2004 Standard Summary Authorization, states: "Crook gives every indication that he believes Bank One has the first lien." [Exhibit 45/Proffer 2].

While the Court agrees that these statements are relevant to Crook's state of mind, they are also clearly out-of-court statements offered for the truth of the matter asserted, i.e., hearsay. FED. R. EVID. 801 ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Although the bank records themselves were generally admissible under the business records exception to the hearsay rule, FED. R. EVID. 803(6),[4] statements contained within those records

---

[4]A "record" that would otherwise constitute inadmissible hearsay is admissible if "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the  . . . report, . . . all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting

must also be admissible.  *See United States v. Ismoila*, 100 F.3d 380 (5th Cir. 1996) ("The

business records exception . . . encompass[es] one level of hearsay: the bank records themselves

and the computer recordation by bank personnel of the oral statements of the cardholders," but

the oral statements of credit cardholders were not admissible under this exception because "it is

not the regular course of business for credit cardholders to fill out affidavits or otherwise give

information to their banks regarding stolen credit cards.").   Crook has offered no argument or

citation supporting the admission of his own alleged statements to someone at Bank One who

then incorporated those alleged statements in the Standard Summary Authorizations.

Accordingly, the Court finds no error in its exclusion of Exhibit 42/Proffer 1 and Exhibit

45/Proffer 2, and Crook's Motion for New Trial on this basis is DENIED.

### b.    Levardsen Letters

Crook also argues that the Court erred in excluding from evidence two letters (Proffers 3

and 4) from AUSA Levardsen to him and his former counsel, Davenport.  Citing Federal Rules

of Evidence 401, 402, and 403, the Court previously ruled:

> In this case, the Levardsen letters simply are not relevant.  While it is the province
> of the United States Attorney's Office to determine whether it will seek an
> indictment, it is the province of the jury to determine whether or not the evidence
> is sufficient to convict a defendant of the charges in an indictment once obtained.
> Even if the letters were of some marginal relevance, their admission would result
> in confusion of the issues and would mislead the jury.

[Doc. No. 46, p.3].  The Court finds no error in that ruling, and Crook's Motion for New Trial on

this basis is DENIED.

---

certification, unless the source of information or the method or circumstances of preparation indicate
lack of trustworthiness." FED. R. EVID. 803(6).

**B.      Prosecutorial Misconduct**

In addition to Crook's arguments regarding the Court's alleged errors, he also argues that he is entitled to a new trial based on three instances of prosecutorial misconduct.

**1.      Rice Spreadsheet Comment**

First, Crook contends that he is entitled to a new trial based on comments made by AUSA Griffing during closing arguments.

In determining whether a prosecutor's remarks affected a defendant's substantial rights, the Court "should consider (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of defendant's guilt." *See United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (citing *United States v. Cardenas*, 778 F.2d 1127, 1131 (5th Cir. 1985)).

Crook was accused in Count 1 of making a false statement to the FSA on April 8, 1999, when he stated that CFP's rice production for the 1998 crop year was approximately 29,106.94 cwt.  He was accused in Count 2 of making a false statement to the FSA on April 19, 1999, when he certified on a "Certification of Disaster Losses" that CFP's rice yield for the 1998 crop year was 23.98 cwt per acre for a total of 1,558.20 acres.  The Government contended that Crook knew that he under-reported CFP's rice production and yield for 1998.

The rice Crook reported was stored at two elevators:  Morehouse Rice and Grain and at Kennedy Rice Dryers.  Terrell Hawkins ("Hawkins"), the manager of Morehouse Rice and Grain, testified that rice produced by CFP **and** CPC on Farm Serial No. 1970 in Catahoula Parish was stored at a rate of 62¢ per bushel.  Hawkins explained that the first two loads of rice delivered to the elevator were put in the name of CPC, and the second two loads were put in the name of

19

CFP.  Hawkins testified that the loads of rice would have been allocated that way at the direction

of a person with authority at the farming entities.

Of the land farmed under this serial number in Catahoula Parish, CFP farmed 1,558.3

acres of rice, and CPC farmed 368.7 acres of rice.  Thus, CFP farmed approximately 80% of the

acreage.  During cross-examination, Crook admitted that approximately 80% of the 62¢ per

bushel rice at Morehouse Rice and Grain should be attributed to CFP.  The Government

calculated this to mean that CFP should have been attributed at least 32,960.2 cwt of rice, and,

based on this admission alone, Crook under-reported CFP's rice production.  The Government

contended, however, that Crook failed to report an additional 45,000 cwt of rice produced by

CFP, but which were booked under a contract Crook executed on April 24, 1998, in the name of

CPC.

During closing argument, Crook's counsel used Exhibit 1029, a summary of **all the rice**

for which there were Morehouse Rice and Grain tickets.   Misunderstanding that fact, AUSA

Griffing made the following statements during her rebuttal:

> Ladies and gentlemen, I guess Mr. Underwood and I were in a different trial
> yesterday because it was very evident, and I am sure you understand it too, and I'll
> remind you, ladies and gentlemen, that your collective memory controls.  Nothing
> that Mr. Underwood and I say is binding on y'all at all.  Y'all's memory controls.
> But we were talking yesterday and Dr. Crook admitted at least 33,000
> hundredweight out of 45,000 hundredweight he didn't report.  So he admitted he
> didn't report to FSA at least 33,000 hundredweight.  The 29,000 that Mr.
> Underwood is trying to confuse you with came from the receipts.  You've seen
> those receipts.  That was clearly reported and it was backed up.  When we were
> talking about the 33,000, that's what he admitted he did not report out of the
> 45,000 hundredweight.  I just want to correct that right off the bat because what
> Mr. Underwood told you was absolutely not correct.

[Transcript of Trial, Day 6, Government's Rebuttal].  AUSA Griffing admits that she made a

20

misstatement when she said that Crook admitted that he did not report 33,000 cwt of rice. Rather, Crook acknowledged that, although at least 32,960.20 cwt of rice was attributable to CFP, he only reported 29,106.94 ctw, a difference of 3,853.26 cwt.

Additionally, the Government points to other trial evidence, both testimonial and documentary, which show that Crook knew prior to his April 1999 statement and certification that the rice production and yield for CFP was far greater than he reported.

Applying the *Wall* test, the Court finds that Crook has failed to satisfy the miscarriage of justice standard. While it is regrettable that AUSA Griffing misunderstood Crook's Exhibit 1029 and misstated the facts during her rebuttal argument, Crook does not contend, nor could the Court find, that she acted in bad faith. As acknowledged by Crook's counsel, AUSA Griffing took over as lead counsel during trial to permit her colleague to attend to a family medical emergency, and she did not have the same familiarity with the evidence that AUSA McCoy and Crook's counsel had. Additionally, Crook's counsel did not make an objection during the rebuttal, which would have easily permitted the Government to correct the error at that time. Instead, he waited until after a lunch break to make his objection, just prior the Court's charging of the jury. Rather than attempt to re-open argument or to instruct the jury on AUSA Griffing's misstatement, the Court determined that the appropriate course of action was to place special emphasis on its reading of the jury instructions on arguments by counsel.[5] Although the Court

_____

[5]In pertinent part, the Court instructed the jury:

As I told you earlier, it is your duty to determine the facts. In doing so, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits. Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the

recognizes the potential confusion and prejudice caused by AUSA Griffing's misstatement, on balance, the Court finds that Crook's Motion for New Trial on this basis must be DENIED.

### 2.      Dr. Louie Crook, Jr. Comment

Crook also contends that AUSA Griffing's statement about his brother, Dr. Louie Crook, Jr., was incorrect, prejudicial, and necessitates a new trial.

During the Government's case in chief, Hawkins testified that, on January 20, 1999, Crook came to Morehouse Rice and Grain and picked up a $345,134.75 check for the sale of the rice stored in the name of CFP and CPC. Crook's father, Louie Crook, Sr., endorsed the check and deposited it in the bank the same day, where it was applied to a CFP loan.  The Government pointed to Crook's action as further evidence that he was aware prior to his statement and certification that CFP had a far greater rice production and yield than reported.

In defense, Crook, who is an emergency room physician, testified that he was working in the emergency room department at Willis-Knighton Hospital in Shreveport, Louisiana, on the day he supposedly picked up the check.  He presented a log from the emergency room department at Willis-Knighton, which showed that "Crook" was in the emergency room on January 20, 1999, during the 7:00 A.M. to 7:00 P.M. shift.  Crook also presented testimony from his farm manager, Sivils, that he began working for the Crook entities on January 17, 1999, that he never notified Crook about the check, and that he recalled that Crook was working Shreveport that entire week, the first week of Sivils' employment.

case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.  In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.

However, during cross-examination, the Government obtained testimony from the Willis-Knighton witness that Crook could have subpoenaed other records which definitely proved that he was in the emergency room that day.

In her rebuttal argument, AUSA Griffing pointed out that Crook had testified only that he did not have time to drive to Mer Rouge, Louisiana, to pick up a check, but he had a plane that he could pilot.  She also pointed out that there was only one patient shown in the log for Crook that afternoon, that Crook was listed as the "admitting" physician, and that there was no charge to the patient.  Finally, she also pointed out that Crook's "brother Louie is also an E.R. physician," so that all the jury knew was that "a Dr. Crook was in their E.R. that afternoon." [Transcript of Trial, Day 6, Government's Rebuttal].

Although Crook testified that his brother also worked in the emergency room at Willis-Knighton when Crook was first hired, Dr. Louie Crook, Jr. had not worked at Willis-Knighton since 1985.  Thus, he could not have been the "Crook" in the emergency room on January 20, 1999.  For that reason, Crook contends that AUSA Griffin misstated the facts, and he should receive a new trial.

Again applying the *Wall* test, the Court finds that Crook has failed to meet his burden of showing a miscarriage of justice based on this misstatement.  There is no evidence that AUSA Griffing acted in bad faith, and Crook's counsel waited until after closings and the lunch break until right before the jury was to be charged to raise this issue.  AUSA Griffing also offered the possibility that Dr. Louie Crook, Jr., was in the emergency room that day, among several other theories as to how Crook could have been logged in at the hospital in Shreveport, but still picked up a check from Hawkins in Morehouse Parish.  Her misstatement was not the only possibility

offered.  Finally, the Court took care to place special emphasis on its reading of the jury instructions on arguments by counsel.  Crook's Motion for New Trial based on this comment is DENIED.

### 3. Unavailable Witness

As a final instance of prosecutorial misconduct, Crook alleges that the Government improperly released one of its witnesses, Tom Casey ("Casey"), without consulting Crook's counsel.

Casey was an officer for Bank One in 2004 and 2005.  He was the main contact between Crook and the bank during the period of time Crook traded and/or sold the equipment identified in Counts 3-8 and gave all proceeds to Bank One.  Prior to trial, Crook's counsel had been unable to locate Casey, but he was located by the Government.  Crook's counsel, Mr. Underwood, and then-lead Government counsel, AUSA McCoy, discussed whether Casey might be able to authenticate certain defense exhibits and the possibility that the parties might stipulate on the admissibility of certain documents.  Casey was listed as a witness for the Government and had been subpoenaed to testify.

However, during the time that Mr. Underwood was ill and AUSA McCoy left to attend to a family emergency, AUSA Griffing and AUSA Van Hook reviewed the Government's witness list in an attempt to streamline its case.  After meeting with Casey, AUSA Griffing and AUSA Van Hook decided that Casey's testimony was unnecessary.  Neither of the Government's attorneys had been privy to the conversations between AUSA McCoy and Mr. Underwood. Therefore, the Government released Casey from his subpoena.

On July 15, Underwood learned that the Government would not be calling Casey, so he

obtained Mr. Casey's contact information from the Government and attempted to have him subpoenaed prior to the end of trial.  Crook did not request a continuance or solicit the Court's or the United States Marshals Service's assistance.  Crook was unsuccessful in serving Casey, and Casey did not testify.

Crook contends that Casey's testimony was "pivotal" to his good faith arguments on Counts 3-8.  While Crook was able to call Littleton, another bank employee, Littleton did not have specific recollection of the events in question and could not identify the documentation that Crook believes Casey could have.

However, much of what Crook wished to have Casey identify were hearsay statements from Crook to Casey or, possibly, another bank employee.  Crook wanted to offer evidence of his own self-serving statements that he thought Bank One had a first lien instead of the FSA.  Even if these statements were admissible under an exception to the hearsay rule, the Court allowed Crook to offer into evidence a letter he had written to Bank One in which he stated that the bank had a superior lien over that of the FSA.

To the extent that Crook wished to obtain testimony from Casey on why Bank One kept the money which should have been tendered to the FSA, such testimony was irrelevant to the criminal charges against Crook.

Under these circumstances, there is no evidence that the Government made Casey "unavailable" or otherwise engaged in prosecutorial misconduct.  *See United States v. Henao*, 652 F.2d 591 (5th Cir. 1981).  To the extent that Casey's testimony could have supported Crook's defense, Crook was allowed to introduce other evidence showing his state of mind. Accordingly, Crook's Motion for New Trial on this basis is also DENIED.

C.      **Sufficiency of the Evidence**

Finally, Crook contends that he is entitled to a new trial because the jury's verdict on all counts is against the weight of the evidence.  Motions for new trial based on insufficiency of the evidence are disfavored and should not be granted unless the defendant "makes a clear showing of an absolute absence of evidence to support the jury's verdict."  *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179 (5th Cir.1999) (citations omitted).

1.      **Counts 1 and 2**

To convict Crook of Counts 1 and 2, the Government was required to prove beyond a reasonable doubt that Crook made a false statement to the FSA, that he knew the statement was false when he made it; and that he did so for the purpose of influencing the action of the FSA to grant CDALP benefits (Count 1) and approve an emergency loan to CFP (Count 2).  *See Fifth Circuit Pattern Jury Instruction 2.51.*

Crook argues that the evidence clearly showed that his under-reporting of rice was not intentional or fraudulent, but was a mistake because he was given the wrong figures by his new farm manager, Sivils.  Sivils admitted that he faxed Crook a summary on March 28, 1999, which had the wrong figures on it, but that he thought the figures were true and correct when he provided them to Crook.  Likewise, Crook argued that it was Sivils who filled out the documentation for the CFP emergency loan application and that it was his mistake that the 45,000 cwt of rice was not included in the figures.

However, the Government also presented extensive evidence showing that, even if Sivils was mistaken in the figures he provided, Crook had sufficient knowledge that those figures were wrong, i.e., that **over 51%** of the total rice production of CFP and CPC had not been reported.

26

If the jury found the evidence presented by the Government more credible than the testimony of Sivils and Crook, it had sufficient evidence to render a verdict of guilt as to Counts 1 and 2. Crook's Motion for New Trial on this basis is DENIED.

### 2.    Counts 3-8

Crook also contends that the evidence was insufficient for the jury to find him guilty of converting collateral mortgaged to the FSA to support loans to CPC.  To convict Crook of Counts 3-8, the Government was required to prove beyond a reasonable doubt that Crook knowingly concealed, removed, disposed of, or converted to his own use, the equipment described in each Count of the Indictment; that the property concealed, removed, disposed of, or converted to his own use, was mortgaged to the United States Secretary of Agriculture, acting through the FSA; that Crook acted with the intent to defraud the United States Secretary of Agriculture, acting through the FSA; and that the property was valued at more than $1,000.00. *See* 18 U.S.C. § 658.

Crook does not deny that he signed the security agreements pledging the equipment to the FSA, that he sold and/or traded the equipment and gave all proceeds to Bank One, or that the property was not valued at more than $1,000.00.  Instead, he argued throughout trial that he believed Bank One had a first lien on the equipment and that he did not intentionally defraud the FSA by giving the proceeds to the bank.

However, even if the jury were to accept Crook's argument that he believed Bank One to have a first lien, he offered no defense or explanation why he failed to disclose to the FSA that he had sold and/or traded the equipment and provided the proceeds to Bank One.  Moreover, the Government also offered testimony from an inspector for the FSA, Randy Thurman

("Thurman"), that he was able to inspect all other pledged property in Franklin Parish without a problem, but Crook would not respond to his letters or telephone calls.  When Thurman was able to contact Crook's farm manager, Larry Givens ("Givens"), he tried to inspect the property with Givens.  Although Givens showed him some smaller pieces of equipment, Givens told Thurman he was not authorized to show him the larger pieces.  When Thurman was finally able to conduct a full inspection, he found the larger pieces of equipment were missing.  Based on this circumstantial evidence, as well as other evidence and testimony presented at trial, the jury had sufficient evidence to render a verdict of guilt against Crook as to Counts 3-8.  Crook's Motion for New Trial on this basis is also DENIED.

## III.   Conclusion

For the foregoing reasons, Crook's Motion for New Trial [Doc. No. 81] is DENIED.

MONROE, LOUISIANA, this 8th day of December, 2010.


ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

28